[No. B064334. Second Dist., Div. Seven. Mar. 7, 1995.]

RICHARD S. GIBSON, Plaintiff and Appellant, v.
ARO CORPORATION, Defendant and Appellant.

## COUNSEL

Jonathan W. Biddle and Donald E. Warner, Jr., for Plaintiff and Appellant.

Jones, Day, Reavis & Pogue, Elwood Lui, Deborah Crandall Saxe and Gregg S. Levin for Defendant and Appellant.

## OPINION

**WOODS (Fred), J. —**

## I.

### INTRODUCTION

Defendant appeals from a judgment entered after a verdict in which the jury found that defendant constructively discharged plaintiff and was liable for unlawful age discrimination. Plaintiff appeals from the order granting a partial new trial on the issue of punitive damages. We initially reduced the punitive damages and affirmed the judgment as modified.

The California Supreme Court granted defendant's petition for review and subsequently transferred the cause to this court with directions to vacate our decision and reconsider the cause in light of *Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238 [32 Cal.Rptr.2d 223, 876 P.2d 1022]. We reverse, as plaintiff cannot prove a constructive discharge as now delineated in *Turner* in that he failed to notify defendant that he considered his working conditions to be intolerable.

## II.

### FACTUAL AND PROCEDURAL SYNOPSIS

A. *Summary of Facts.*

Richard S. Gibson began working for Aro Corporation in 1965. From 1976 until July 1987, he was the head of Aro's field sales force in region 61, which covers the 13 western states. Region 61 included California, which is one of the most important states for the sales of Aro products because of its diverse business base and large number of manufacturers. It is the largest potential market in the United States for Aro's tool and hoist products.

Aro was purchased by another company in late 1985 and David Black, its new president, was directed to increase Aro's profits. To that end, Black decided to strengthen Aro's field sales force. Black's first step was to hire Jack Taylor, a 55-year-old who had recently retired from the Norton Company (Norton).

After carefully examining Aro's field sales force for several months, Taylor and Dennis Weaver, Aro's newly promoted general sales manager, decided that Gibson was not the right person to be heading up the field sales force in Aro's important west coast region. Among other things, Gibson fell asleep at business meetings and William Baribault, the most important customer in Gibson's region, repeatedly complained that Gibson was not giving his company the level of service it needed and expected from Aro. In addition, Gibson appeared to be totally disinterested in Aro's new owner's goal of increasing profits and demonstrated to Taylor that he had very little knowledge about the distributors in his region and, worse, had never even heard of one of the largest distributors in the northwestern United States.

Furthermore, sales in region 61 (where Gibson was the regional manager) were flat in 1985 and 1986, and a mid-1986 study of Aro's tool and hoist business indicated that sales in that region were extremely poor. Moreover, the field sales representatives in Gibson's region failed to achieve their sales quota by $2 million in fiscal year (FY) 1985 and by almost $3 million in the 16-month period ending March 31, 1987. Gibson's region made only 85 percent of its quota during FY 1987 and was Aro's poorest performer during the first quarter of calendar year 1987.

For the foregoing reasons, Taylor and Weaver decided to remove Gibson from the regional manager position and to replace him with someone with the ability to increase Aro's sales in the 13 western states. They ultimately

selected Richard Sheron to replace Gibson as regional manager. Sheron was 54 years old and, like Taylor, recently had retired from Norton, where he had had extensive experience managing the sales force in Norton's western region. Sales in region 61 increased significantly under Sheron's leadership.

Taylor and Weaver decided to give Gibson two options: (1) Gibson could continue working for the company in a field sales position in region 61, or (2) he could continue on the payroll until September 1, 1987, at which point he would receive a lump sum severance payment of $60,000 and would be eligible (they thought) to elect early retirement under the Aro pension plan.[1]

Weaver and Taylor met with Gibson at Aro headquarters in Ohio on April 24, 1987. Weaver told Gibson that a management change was needed in region 61, but that Gibson was not going to be fired because he had been a loyal employee for a long time. He explained that Gibson's region was performing below other regions and the company felt Gibson did not have the desire or capability to change to meet the new demands. Weaver told Gibson that if he chose to stay with the company, he would be the assistant district manager in territory 1017 earning a salary of about $2,700 per month plus an unspecified commission.[2] Gibson also was presented with the severance option and was told that he had until May 11, 1987, to decide which option he would take. Taylor encouraged Gibson to take the severance option and then look for a new job—shop himself around—as he (Taylor) had done at Norton.

Later that day, Weaver learned that Gibson would not be eligible to elect early retirement under the Aro pension plan until September 1, 1988, when he would be age 62 (with 15 years of service). He therefore immediately amended Gibson's severance option to add a paid leave of absence from September 1, 1987, until September 1, 1988.

At Gibson's request, Taylor and Weaver met with him in Los Angeles on May 11, 1987. Gibson asked why he had been removed from the regional

---

[1] By assuring that Gibson would remain on the Aro payroll until he was eligible for an Aro pension, Aro was ensuring that Gibson would have life and health insurance for himself and his wife, largely at Aro's expense, throughout his retirement.

[2] At Aro, field sales representatives are called district managers and assistant district managers. There is a district manager for each geographic territory. Some territories also have one or more assistant district managers. The only difference between a district manager and an assistant district manager is that the district manager is responsible for the paperwork for the territory. Both sell Aro products to distributors.

Territory 1017 was in Southern California, where Gibson had lived since 1976. Gibson knew there was meaningful work for him there since, in his own written opinion, territory 1017 needed another sales representative, as it was too large for one sales representative to handle.

The salary Aro offered Gibson ($2,700 per month) was the highest salary of any district manager or assistant district manager at Aro.

manager position and asked them to reconsider their decision. Taylor and Weaver told Gibson they would not reconsider. Taylor also said he did not think Gibson had the energy level to do the job they wanted regional managers to do. He also told Gibson, "maybe this isn't fair[,] but we're going to have to get this region up to speed . . . ." Gibson then said he would take the sales job.

During a telephone conversation with Gibson on or about May 22, 1987, Weaver reiterated that, as assistant district manager, Gibson would have a monthly base salary of $2,700, plus commissions estimated at $265 per month, a car allowance of $385 per month, and an expense budget of $500 per month.

Sheron became the regional manager of region 61 on July 1, 1987, and Gibson began working as a field sales representative on that date. Gibson was 60.

Weaver wrote Gibson a confidential letter on July 1, 1987, enclosing his sales quota and telling him, "Dick, I respect your choice to stay with the company and assume a field sales job. I know Greg [Krueger] can count on you to put forth a strong effort."[3] Krueger, the district manager in territory 1017, met with Gibson in July, and they split up the territory. Krueger did nothing else that resembled supervision of Gibson.

As a field sales representative, Gibson made very few sales calls. He began looking for a new job in late September 1987 and found one in just a few weeks. He applied for a job at Grover Manufacturing Co. on October 14, 1987, and started working there on Monday, November 2, 1987.

On Friday, October 30, 1987, Gibson's last day at Aro, Sheron wrote a note on the back of Gibson's October call report before sending it to Weaver in Ohio. The note said, " 'Dennis, as you can see, Dick isn't working himself to death. Five calls last week, 12 the week before' " and " '6 the week before that.' " Gibson saw this note for the first time at trial.[4]

B.  *Procedural Background.*

The jury found that Gibson was constructively discharged because of his age and awarded him economic damages in the amount of $507,385 and

---

[3]Gibson's sales quota was established on July 1, 1987, when he began working as a sales representative and was never changed during the remainder of his tenure with the company. Effective July 1, 1987, territory 1017 was given a new sales quota to reflect the fact that there were now two sales representatives in the territory.

[4]Sheron never gave a copy of this note to Gibson and, in fact, never mentioned it to him. Nor did Weaver show the note to Gibson or mention it to him; Weaver simply read the note and filed the call report away.

emotional distress damages in the amount of $360,000. It also awarded Gibson punitive damages in the amount of $3,275,000.

The trial court denied Aro's motion for judgment notwithstanding the verdict, but granted part of Aro's new trial motion. Finding the economic damages to be excessive, it ordered a new trial unless Gibson accepted a remittitur of the economic damages to $162,933. It also ordered a new trial on the issue of punitive damages. Gibson accepted the remittitur, resulting in a total award of $522,933 ($162,933 for economic damages and $360,000 for emotional distress), plus attorney fees of approximately $280,000.

In our now vacated decision, we upheld the trial court's liability finding and impliedly reversed the trial court's decision to order a new trial on the issue of punitive damages. This court reduced the punitive damages award to $275,000.

This court upheld the trial court's age discrimination finding on the grounds that (1) the reasons proffered by Aro were "based upon . . . stereotypical excuses which describe a possible age characteristic but makes no reference to age," (2) "Aro agents did not follow its own company policy where job performance was an issue," and (3) "Aro agents were aware of Gibson's age and considered it before offering of the options."

## III.

### ISSUES TO BE DECIDED

1. After due consideration of the decisional law established in *Turner*, should the judgment for Gibson, finding that he was constructively discharged by Aro, be affirmed;

2. In light of *Turner*, should judgment be entered as a matter of law in favor of Aro since Gibson was not constructively discharged;

3. In any event, is Aro entitled to a new trial with jury instructions based on *Turner*.

## IV.

### DISCUSSION

A. *Turner Mandates Reversal Because, as a Matter of Law, a Demotion Is Not Enough to Compel a Reasonable Person to Resign.*

The *Turner* court held that: "The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the

normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. *The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." (Turner v. Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1246, italics added.)

The *Turner* court went on to explain that, as a matter of law, a demotion with a cut in pay does not create the kind of aggravated or intolerable circumstances that would compel a reasonable employee to quit his job. It said: "a demotion, even when accompanied by reduction in pay, does not by itself trigger a constructive discharge." (7 Cal.4th at p. 1247.) Although disapproved on another point, the *Turner* court cited language in this division's decision in *Soules* v. *Cadam, Inc.* (1991) 2 Cal.App.4th 390, 401 [3 Cal.Rptr.2d 6] that " 'demotion of job level, even when accompanied by reduction in pay, does not constitute constructive discharge.' " (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at pp. 1247, fn. 4, and 1251.)

▮ In Gibson's opposition brief, he argued that intolerable working conditions could be found in this instance because of "the onerousness of the supervision after the demotion." We searched the record in vain, however, to find evidence that Gibson ever saw or heard from Weaver, Taylor or Sheron after his demotion or that he ever received anything in writing from any of them. Moreover, the only evidence found in this record relating to Gibson's alleged "supervision" by Krueger is that Gibson met with him once after Gibson's demotion, at which point they split up the territory. Gibson himself testified at trial that, other than meeting with Gibson to split up the territory, Krueger did nothing that resembled supervision.

There was evidence that Sheron once sent a note to Weaver that was critical of Gibson's performance. This note stated: " 'Dick isn't working himself to death. Five calls last week, 12 the week before' " and " '6 the week before that.' " This note was insufficient under *Turner* to compel a reasonable person to resign. (See 7 Cal.4th at p. 1255 ["a single negative performance rating does not amount to a constructive discharge"].) More importantly, this note plainly did not cause Gibson to resign—he saw it for the first time at trial.[5]

Gibson also has argued that intolerable working conditions could be found here because of his "two-step demotion, the huge pay reduction . . . and the requirement that Gibson make frequent contact with . . . customers and

---

[5]See footnote 4, *ante,* page 1633.

distributors." We have difficulty in understanding what Gibson refers to by referencing a "two-step demotion." We discern that if a demotion is "two-step," it is still a demotion no matter how it is viewed. We find the other intolerable things mentioned by Gibson merely to be direct and natural consequences of his demotion. He received a salary commensurate with his new position and, like all other field sales representatives working for Aro, he was expected to make sales calls on Aro customers and distributors. It is a reasonable inference that that is what field sales representatives do. People who are demoted naturally have new job responsibilities, new supervision, and lower pay. Inferentially, that is what is supposed to happen when one is demoted.

Gibson's embarrassment about working as a sales representative does not convert his demotion into a constructive discharge. ■ Under *Turner*, the proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reaction to those conditions. (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1248.)

This division has already so held. The plaintiff in *Soules* found it emotionally difficult to be demoted, and this court nevertheless affirmed the trial court's decision to enter summary judgment for the employer on the plaintiff's constructive discharge claim. In so doing, it observed that: "Since *demotion* of an employee or criticism of his job performance—even if alleged to be unfair or outrageous—does not permit the employee to bypass the remedy afforded by the workers' compensation law and sue his employer for emotional distress and resultant physical disability caused by such conduct, the same conduct does *not create the intolerable working conditions necessary to support a claim of constructive discharge.*" (*Soules* v. *Cadam, Inc., supra*, 2 Cal.App.4th at p. 401, italics added.)

Gibson's argument that he was subordinated "to a former subordinate" appears to be a reference to the fact that Aro made him an assistant district manager, rather than the district manager, of territory 1017, so that he was subordinated to Krueger. This argument ignores the fact that, other than regional manager, there were only two job classifications in sales in region 61—district manager and assistant district manager. The district managers and assistant district managers did exactly the same job—both sold Aro products to distributors. The only difference was that the district managers had to complete the paperwork for the territory. Gibson's argument also ignores the fact that Gibson's salary was more than $1,000 per month higher than Krueger's salary, and Gibson knew it. It also ignores that, as noted above, Gibson and Krueger split up the territory and Krueger did nothing

else that resembled supervision. It clearly was not intolerable, extraordinary, or egregious for Gibson to be subordinated to Krueger. Bruised egos and hurt feelings are not part of the *Turner* equation. The standard is an objective one, and the proper focus is on the working conditions themselves. (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at pp. 1248, 1251.)

Krueger was one of Aro's top 10 sales representatives. He had been the district manager in territory 1017 for approximately nine years when Gibson was added to it as another field sales representative. Gibson undoubtedly would have preferred that Aro change Krueger's status so Gibson could be the district manager. However, under *Soules*, this challenge to Aro's judgment of how best to run its business cannot form the basis for a constructive discharge finding as a matter of law—an employer's decision to place an employee in a particular position, rather than another, is a normal part of the employment relationship. As this court observed in *Soules*, " '[i]n order to properly manage its business, every employer must on occasion review, criticize, demote, transfer and discipline employees.' " (*Soules* v. *Cadam, Inc.*, *supra*, 2 Cal.App.4th at p. 401.)

B.  *Turner Mandates Reversal Because Gibson's Working Conditions Never Were Intolerable and Certainly Were Not Intolerable at the Time of His Resignation.*

Under *Turner*, a constructive discharge can be found only if the plaintiff's working conditions were "so intolerable or aggravated at the time of the employee's resignation that . . . a reasonable person in the employee's position would be compelled to resign." (*Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1251.) At the time of his resignation, Gibson had been performing the duties of a field sales representative at a salary of $2,700 per month, plus commissions, for four full months. He had the highest salary of all the Aro field sales representative at Aro, and his salary was more than $1,000 more than Krueger's. He was working in a sales territory in his own backyard in which there was ample work and where Krueger treated him as a colleague. He was performing the same duties as other sales representatives (for more pay) and was not being harassed (or even bothered) by anyone. There is nothing even arguably intolerable about these working conditions.

The field sales representative job was not the job Gibson would have preferred. However, under *Turner*, an employee is not permitted to quit and sue simply because he or she does not like a new job assignment.

C. *Turner Mandates Reversal Because Gibson Did Not Tell Aro (and Aro Never Knew) He Considered His Working Conditions as a Sales Representative to Be Intolerable.*

In overruling *Brady* v. *Elixir Industries* (1987) 196 Cal.App.3d 1299 [242 Cal.Rptr. 324], *Turner* found the *Brady* test[6] for constructive discharge to be inadequate because it did not further the policy of ensuring corrective measures in the workplace, rather than windfall lawsuits to sensitive employees:

"[W]e conclude that *Brady*'s test is inadequate to the extent it allows a claim for wrongful discharge on a finding that the employer had mere constructive knowledge of the intolerable conditions leading to an employee's resignation, because such a test does not further the *Brady* court's goal of insuring corrective measures will be attempted before a lawsuit is required." (*Turner* v. *Anheuser-Busch, Inc., supra*, 7 Cal.4th at p. 1248.)

The *Turner* court made it clear that its intent was to require notification to the employer: "By requiring employees to notify someone in a position of authority of their plight, we permit employers unaware of any wrongdoing to correct a potentially destructive situation, and we prevent employers from shielding themselves from constructive discharge lawsuits simply by deliberately ignoring a situation that has become intolerable to a reasonable employee. Indeed, our test furthers the *Brady* court's stated goal that a constructive discharge test should encourage an employer to take corrective action if notified of the intolerable working conditions." (7 Cal.4th at p. 1250.) Similarly, the *Turner* court observed that: "a standard requiring the employer's actual (rather than mere constructive) knowledge of the intolerable conditions . . . serves to emphasize a central aspect of constructive discharge law—the resignation must be employer-caused and against the employee's will." (*Id.*, at p. 1249.)

Aro plainly did not have actual knowledge of any intolerable working conditions. In fact, Gibson admitted he did not tell any of his superiors he found his new job at Aro to be intolerable. As he testified at trial:

---

[6]*Brady* established a three-part test for determining whether a resignation is a constructive discharge. It required the plaintiff to demonstrate:

"(1) the actions and conditions that caused the employee to resign were violative of public policy;

"(2) these actions and conditions were so intolerable or aggravated at the time of the employee's resignation that a reasonable person in the employee's position would have resigned; and

"(3) facts and circumstances showing that the employer had actual or constructive knowledge of the intolerable actions and conditions and of their impact on the employee and could have remedied the situation." (*Brady* v. *Elixir Industries, supra*, 196 Cal.App.3d at p. 1306.)

"Q. Before July 1, 1987, which is the day on which you became an assistant district manager at Aro, did you ever tell Mr. Weaver that it would be intolerable for you to work for Aro as an assistant district manager?

"A. Prior to what time, ma'am?

"Q. Prior to taking the job on July 1, 1987.

"A. I didn't know that until—until I took the job. . . .

"Q. After July 1, 1987, did you ever complain to Mr. Weaver about the assistant district manager job?

"A. Did I complain to Mr. Weaver?

"Q. Yes.

"A. Not that I recall.

"Q. Did you ever tell him that that job was intolerable?

"A. Not that I recall.

"Q. After July 1, 1987, did you ever complain to Mr. Taylor?

"A. No.

"Q. You never told him that the assistant manager job was intolerable?

"A. No.

"Q. After July 1, 1987, did you ever complain to Mr. Black about the job?

"A. No.

"Q. And you never told Mr. Black that the assistant district manager job was intolerable?

"A. No."

By failing to give Aro notice that he considered his working conditions to be intolerable, Gibson gave Aro no opportunity to address his concerns. His admissions destroy any possibility that he ever could meet his burden under *Turner*.

When disapproving the constructive knowledge element of the *Brady* test, the Supreme Court unequivocally stated that, before a constructive discharge can be found, the employer must be aware of the impact of the events on the employee, not merely of the fact that the event or conduct occurred: "In order to establish a constructive discharge, an employee must plead and prove, by the usual preponderance of the evidence standard, that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at p. 1251.) The *Turner* court also stated that ". . . the employer must either deliberately create the intolerable working conditions that trigger the resignation or, at a minimum, must know about them and fail to remedy the situation in order to force the employee to resign." (*Id.,* at pp. 1249-1250.)

## V.

### DISPOSITION

The judgment is reversed and remanded with directions to the trial court to enter a new and different judgment in favor of defendant Aro Corporation. Aro is awarded costs of appeal.

Lillie, P. J., concurred. Johnson, J., concurred in the judgment only.

A petition for a rehearing was denied April 4, 1995. Johnson, J., was of the opinion that the petition should be granted. The petition of appellant Richard S. Gibson for review by the Supreme Court was denied June 14, 1995. Kennard, J., was of the opinion that the petition should be granted.