[No. D025565. Fourth Dist., Div. One. July 2, 1998.]

DANIEL KOVATCH, Plaintiff and Appellant, v.
CALIFORNIA CASUALTY MANAGEMENT COMPANY, INC., et al.,
Defendants and Respondents.

**COUNSEL**

Nicholas R. De Biase for Plaintiff and Appellant.

Keker & Van Nest and James M. Emery as Amici Curiae on behalf of Plaintiff and Appellant.

Fox & Grove, Mark I. Schickman and Kathleen D'Armagnac for Defendants and Respondents.

**OPINION**

**NARES, J.**—Daniel Kovatch appeals from a summary judgment in favor of defendants California Casualty Management Company, Inc. (CCMC), Paul Rapp and Dean Aldinger on Kovatch's complaint for wrongful termination. Kovatch alleged he was constructively discharged from his employment with CCMC because of harassment based on his sexual orientation, in violation of public policy and in breach of an implied contract requiring good cause for termination. The trial court concluded Kovatch's employment was at will and that Kovatch was validly terminated because he failed to return to work after exhausting his disability leave. We agree with the trial court that Kovatch was employed at will and accordingly affirm the judgment as to Kovatch's cause of action for breach of contract. However, we also conclude that triable issues of fact exist as to whether a reasonable employee in Kovatch's position would have found the conditions of employment at CCMC intolerable because of sexual orientation harassment. Accordingly, we reverse the judgment as to Kovatch's tort causes of action for wrongful

termination in violation of public policy and intentional infliction of emotional distress.

FACTUAL AND PROCEDURAL BACKGROUND

Kovatch was first hired by CCMC in October 1989 to work as an insurance sales representative in CCMC's Orange County office. As part of his employment application, Kovatch signed a section providing as follows: "In consideration of my employment, I agree to conform to the rules and regulations of CALIFORNIA CASUALTY MANAGEMENT CO., and my employment and compensation can be terminated, with or without cause, at any time, at the option of either the Company or myself. I understand that no representative of CALIFORNIA CASUALTY MANAGEMENT CO. other than the President of the Company, has any authority to enter into any agreement for employment for any specified period of time, or to make any agreement contrary to the foregoing." Later, Kovatch signed a document entitled "Employment Agreement" which stated: "CCMC has offered to employ [Kovatch] subject to . . . the terms and conditions . . . set forth in the CCMC employee handbook and personnel manual. [Kovatch] desires to accept such employment on the basis offered." Kovatch also signed an acknowledgment of receipt of the CCMC employee handbook. The handbook Kovatch received provided: "Any individual may voluntarily leave employment with California Casualty Management Co. upon proper notice, and may be terminated by California Casualty Management Co. at any time and for any reason."

In September 1991, Kovatch applied for a promotion to the position of sales supervisor in CCMC's Walnut Creek office. Kovatch received the promotion and worked in Walnut Creek from January 1992 until August 1993, when he transferred to a sales supervisor position in the San Diego office. In San Diego, Kovatch reported to Aldinger, who was the sales manager for the office. Aldinger in turn reported to Rapp, who was the district manager responsible for San Diego.

What happened during Kovatch's three-month tenure at CCMC's San Diego office is the subject of serious dispute between the parties. Defendants assert that Kovatch displayed various performance problems which, by November 1993, required the presentation of a training plan to Kovatch. According to Aldinger, on November 10, 1993, he told Kovatch that he and Rapp wanted to meet with Kovatch the following day. The purported purpose for the meeting was to present the training plan to Kovatch.

Kovatch claims a different version of events. According to Kovatch, from the very beginning of his employment in San Diego he suffered a continuous

pattern of harassment and discrimination based on his sexual orientation, largely, though not exclusively, from Aldinger. Kovatch claims this conduct culminated in a meeting with Aldinger at which Aldinger told him: "Let me make something loud and clear to you, Dan. I don't like you. You're a faggot, and there is no place for faggots in this company. And when Paul [Rapp] and I meet with you tomorrow, you're fired."

Both sides agree that the intended meeting between Kovatch, Aldinger and Rapp never occurred because Kovatch never returned to the office. On November 16, Aldinger received a doctor's note from Kovatch stating that Kovatch had been unable to work since November 11 but that he should be able to return by November 22. On November 22, however, Kovatch requested and received a disability leave of absence through February 11, 1994.

In the meantime, on November 16, Kovatch sent a facsimile to CCMC's human resources department in which he complained that "inconsistencies in rules and policies in the San Diego Office" had created an "uncomfortable and hostile work environment" for him. Although he complained about Aldinger's treatment of him in relation to various matters, Kovatch did not expressly inform CCMC that he believed he had been subjected to harassment because of his sexual orientation. On December 9, however, Kovatch filed a complaint for sexual orientation discrimination with the Labor Commission. In his complaint, Kovatch claimed Aldinger had discriminated against him because of his sexual orientation, including threatening to fire him because he was gay.

On January 13, 1994, Kovatch declared himself a resident of the City of West Hollywood and registered to run for a city council seat there. He engaged in a political campaign for that position until the April 12 election. According to Kovatch, however, he had "no real intention to win" the election.

In late January, CCMC's San Diego office received a letter from a discrimination complaint investigator at the Department of Industrial Relations informing CCMC of Kovatch's complaint. Upon receipt of the letter Rapp delivered it to Marianne Jones, CCMC's employment and employee relations manager. From January 25 through January 28, Jones investigated Kovatch's allegations of sexual orientation discrimination. On January 31, Jones sent a letter to the discrimination complaint investigator stating that she had found no corroborating evidence or witnesses. According to Jones, Aldinger denied threatening to fire Kovatch because he was gay.

Meanwhile, that same day, Kovatch sent a letter to CCMC's division manager reiterating his complaints about Aldinger's treatment of him. Also,

Kovatch submitted a request to extend his leave of absence until May 11, which he understood to be the maximum length of time permitted by CCMC's leave of absence policy.[1] That request was granted.

On February 2, Kovatch sent a memorandum to CCMC's human resources department elaborating on the matters raised in his November 16 letter. Around February 25, Jones and Kovatch spoke by telephone regarding Kovatch's memo. They also spoke about whether Kovatch intended to return to work. According to Jones, Kovatch told her he would not return to the San Diego office. According to Kovatch, Jones asked him whether he wanted a monetary settlement, then asked whether he still wanted to work for CCMC. Kovatch claims he told Jones that he did want to work for CCMC, but he did not want to work for Aldinger. Jones then asked whether he would be willing to take a sales representative position in Glendale. When informed that he would have to take a cut in salary, Kovatch claims he told Jones "no."

On February 28, Jones wrote to Kovatch and told him that because he had indicated he did not want to return to the San Diego office, CCMC would take steps to fill the sales supervisor position there. She further indicated that although she had found no corroborating evidence to support his allegations of discrimination, she would continue to "monitor [his] concerns." Finally, Jones wrote: "If you decide to seek a return to an available position, your work environment would be free from any harassment or retaliation." CCMC posted the San Diego sales supervisor position on March 7 and filled it on March 11.

On March 28, Jones received a letter from Kovatch's attorney, Nicholas R. De Biase, responding to Jones's letter of February 28. De Biase stated that Kovatch intended to return to his position as a sales supervisor prior to May 11. De Biase further stated that if CCMC was unable to provide Kovatch with a sales supervisor position, and Kovatch's only options were to return to work in a demoted position in a different office or to take a monetary settlement from CCMC, Kovatch would consider it a constructive termination of his employment with CCMC.

Jones responded to De Biase's letter on April 5. Jones stated that in her February 25 telephone conversation with Kovatch, she told Kovatch "that if he and his doctor determined that he could return to work, he would need to notify me so we could complete the return from leave of absence procedures and discuss options for his employment and the openings for which he

---

[1]CCMC's written leave of absence policy provided for a maximum leave of 180 calendar days.

would qualify." She further stated that during that conversation "Mr. Kovatch did not say what he intended to do or what he wanted except that he definitely did not intend to return to work in the San Diego office." Finally, Jones wrote: "when [Mr. Kovatch] is ready to return to work and his doctor releases him, I urge him to contact my office to discuss any openings we may have at that time."

On May 11, De Biase wrote to Jones and briefly advised her that "the physicians attending to Daniel Kovatch are of the opinion that Mr. Kovatch continues to suffer from physical and emotional conditions arising from the conduct of Dean Aldinger and Paul Rapp in wrongfully terminating Mr. Kovatch's employment with California Casualty Management Co." Jones later received a doctor's note dated May 20 stating that Kovatch was continuing to suffer symptoms related to stress from work and that "[u]ntil these work-related issues are resolved, I do not feel that the patient is able to work." Nonetheless, on May 18, Kovatch applied to become an agent with the Farmers Insurance Group. Kovatch began working for Farmers part time sometime in mid-May.

On May 26, CCMC's benefits administrator wrote to Kovatch and informed him that because he had reached the end of the maximum leave period allowed under CCMC's leave of absence policy, his employment with CCMC was terminated effective May 11. The letter further stated: "You are free to apply for re-employment, at any time and for any position for which you feel qualified by education and experience. We have repeatedly invited you to let us know if you wanted to return to work in an available position and we have not heard anything from you about pursuing any employment opportunities with California Casualty. We again urge you to do so."

Despite CCMC's offer, Kovatch did not seek reinstatement with CCMC. Instead, in November 1994, Kovatch filed a complaint against CCMC, Aldinger and Rapp alleging three causes of action: (1) termination in violation of public policy based on sexual orientation; (2) breach of implied contract of continued employment; and (3) intentional infliction of emotional distress.

In November 1995, defendants moved for summary judgment, asserting that Kovatch was not constructively discharged or terminated because of his sexual orientation, that he was an at-will employee, and that his emotional distress claim was preempted by California's workers' compensation laws. The trial court granted defendants' motion, concluding that the incidents of harassment identified by Kovatch "were isolated instances and do not rise to the level of a continuous pattern of discrimination as required for constructive discharge." The court further concluded that Kovatch "was terminated

because he failed to return to work after exhausting his medical leave" and that Kovatch "failed to offer any competent evidence to create a triable issue of fact that [his] termination was pretextual." Kovatch appeals from the judgment against him.

DISCUSSION

I

*Standard of Review*

"The summary judgment procedure aims to discover whether there is evidence requiring the fact-weighing procedures of a trial. [Citation.] '[T]he trial court in ruling on a motion for summary judgment is merely to determine whether such issues of fact exist, and not to decide the merits of the issues themselves.' [Citation.] The trial judge determines whether triable issues of fact exist by reviewing the affidavits and evidence before him or her and the reasonable inferences which may be drawn from those facts. [Citation.]" (*Morgan* v. *Fuji Country USA, Inc.* (1995) 34 Cal.App.4th 127, 131 [40 Cal.Rptr.2d 249].)

To prevail on a motion for summary judgment, a defendant must show that one or more elements of the plaintiff's cause of action cannot be established or that there is a complete defense to that cause of action. (Code Civ. Proc., § 437c, subd. (o)(2).) "On review of a summary judgment in favor of the defendant, we review the record de novo to determine whether the defendant has conclusively negated a necessary element of the plaintiff's case or demonstrated that under no hypothesis is there a material issue of fact that requires the process of trial." (*Ann M.* v. *Pacific Plaza Shopping Center* (1993) 6 Cal.4th 666, 673-674 [25 Cal.Rptr.2d 137, 863 P.2d 207].) The evidence of the moving party is strictly construed and that of the opponent is liberally construed, and any doubts as to the propriety of granting the motion are to be resolved in favor of the party opposing the motion. (*Branco* v. *Kearny Moto Park, Inc.* (1995) 37 Cal.App.4th 184, 189 [43 Cal.Rptr.2d 392].)

II

*Wrongful Termination in Violation of Public Policy*

California law expressly prohibits discrimination in any aspect of employment based on actual or perceived sexual orientation. (Lab. Code, § 1102.1, subd. (a).) Accordingly, a plaintiff who was actually discharged

because of his or her sexual orientation may bring a tort claim for wrongful termination in violation of public policy. (*Leibert* v. *Transworld Systems, Inc.* (1995) 32 Cal.App.4th 1693, 1702-1704 [39 Cal.Rptr.2d 65].) Likewise, a plaintiff who was constructively discharged because of harassment based on actual or perceived sexual orientation may bring such a claim. (Cf. *Rojo* v. *Kliger* (1990) 52 Cal.3d 65, 88-91 [276 Cal.Rptr. 130, 801 P.2d 373].) "Constructive discharge occurs when the employer's conduct effectively forces an employee to resign." (*Turner* v. *Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1244 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) To prevail on a constructive discharge claim, the plaintiff must show that the working conditions giving rise to the resignation were "intolerable"—that is, so unusually adverse that a reasonable person in the plaintiff's position would have felt compelled to resign. (*Id.* at p. 1247.)

Here, defendants offered evidence to show that Kovatch was terminated from his employment with CCMC, not because of his sexual orientation, but because he failed to return to work after exhausting his disability leave. However, Kovatch contends the only reason he was on disability leave in the first place was because of the intolerable harassment and discrimination he encountered in CCMC's San Diego office due to his sexual orientation. He further suggests that he reasonably refused to return from leave because CCMC informed him he could either return to the discriminatory environment in San Diego under Aldinger or accept a sales representative position in Glendale. In effect, Kovatch contends he was constructively discharged because CCMC gave him a choice between working under intolerable conditions of harassment or accepting a demotion.

In determining whether a constructive discharge occurred, the touchstone of the analysis is the reasonable employee. (See *Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at p. 1248.) "Whether conditions were so intolerable as to justify a reasonable employee's decision to resign is normally a question of fact." (*Valdez* v. *City of Los Angeles* (1991) 231 Cal.App.3d 1043, 1056 [282 Cal.Rptr. 726].) Nonetheless, in some situations a court may conclude as a matter of law that a reasonable employee would not have felt compelled to resign. (See *ibid.*) In such situations, summary judgment is proper. (See, e.g., *Casenas* v. *Fujisawa USA, Inc.* (1997) 58 Cal.App.4th 101, 115 [67 Cal.Rptr.2d 827].)

The question presented here is whether there was sufficient evidence for the trier of fact to find that a reasonable employee in Kovatch's position would have felt compelled not to return to work for CCMC. To answer that question, we must first examine in some detail the evidence offered by Kovatch to show that the conditions he experienced in the San Diego office

were intolerable due to sexual orientation harassment. If no reasonable juror could find those conditions, as revealed by Kovatch's evidence, intolerable, then Kovatch's claim of constructive discharge necessarily fails as a matter of law.

 In assessing whether summary judgment was appropriate, ". . . the facts alleged in the evidence of the party opposing summary judgment and the reasonable inferences therefrom must be accepted as true." (*Sada* v. *Robert F. Kennedy Medical Center* (1997) 56 Cal.App.4th 138, 148 [65 Cal.Rptr.2d 112].) Accordingly, in assessing the conditions in CCMC's San Diego office, we accept as true Kovatch's version of events, to the extent it is supported by admissible evidence.[2] However, not all of the evidence upon which Kovatch relies to show intolerable conditions in the San Diego office is relevant for that purpose. The determination of whether a person was constructively discharged depends on the working conditions that person encounters. (See *Turner* v. *Anheuser-Busch, Inc., supra,* 7 Cal.4th at pp. 1244-1247.) Thus, a plaintiff claiming constructive discharge due to harassment must show that he was personally exposed to the harassing conduct, even if the conduct was not directed at him. (See *Fisher* v. *San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590, 610-613 [262 Cal.Rptr. 842].) To the extent Kovatch identifies incidents of offensive behavior, but fails to offer evidence that those incidents occurred in his presence or that he learned of them before the termination of his employment, we disregard those incidents in assessing the adverse nature of the working conditions Kovatch experienced.[3] (Cf. *Gibson* v. *Aro Corp.* (1995) 32 Cal.App.4th 1628, 1637 [38 Cal.Rptr.2d 882] [note critical of employee's performance which employee saw for first time at trial did not cause employee to resign].) Of course, to the extent those incidents may tend to prove that other offensive behavior Kovatch encountered or otherwise learned of was motivated by antigay animus, we consider those incidents for that purpose.

Liberally construing Kovatch's evidence, albeit with the foregoing restriction in mind, the record reveals Kovatch experienced the following incidents in CCMC's San Diego office.

---

[2]In the trial court, defendants submitted numerous written objections to the evidence offered by Kovatch. For the most part, defendants have not expressly renewed those objections in their appellate brief. To the extent they have, however, we have taken those objections into account in our recitation of the facts. (See *Biljac Associates* v. *First Interstate Bank* (1990) 218 Cal.App.3d 1410, 1422 [267 Cal.Rptr. 819] [where party submitted voluminous objections below, Court of Appeal addressed only those briefed on appeal].)

[3]For example, Kovatch offered evidence that a sales processing supervisor called him a "fag" on three to five occasions. However, Kovatch offered no evidence that the name-calling occurred in his presence, nor any evidence that he became aware of the name-calling before the termination of his employment with CCMC.

On August 13, 1993, Aldinger told Kovatch that the area in which Kovatch was living (Hillcrest) was the "fag capitol of San Diego." Three days later, Aldinger remarked to Kovatch at a dinner that their waiter "looks like a big fag."

On September 10, Aldinger told Kovatch that one of the sales representatives was a "fag" because he wore an "earring in his right ear and a big pair of black boots" to the gym. Aldinger also told Kovatch that another employee who came to meetings in big black shoes and baggy suits was fired because he was gay, that Aldinger had a lot to do with that employee being fired, and that Rapp, while drunk at a restaurant, had stated that the employee was "a big faggot and I hate faggots." Aldinger then warned Kovatch that CCMC is not the company to be in if you are gay. Around the same time, Rapp and Aldinger commented in what Kovatch felt was a derogatory manner on the fact that Kovatch had taken a male guest to the symphony.

In mid-September, Aldinger began to display what Kovatch perceived as animosity toward Kovatch. For example, Aldinger moved his seat when Kovatch sat down next to him and ignored Kovatch when Kovatch said "hello." Aldinger informed Kovatch that two female sales representatives, McFarland and Morgan, thought Kovatch had a "problem with women." At an office luncheon, Aldinger commented that Kovatch was "one of those Hillcrest guys." Aldinger later told Kovatch that he had better get his act together and added, "I know you have a problem with women." Three days later, Aldinger told Kovatch that McFarland and Morgan and a female supervisor, DeBeauville, did not like him.

At some point, Aldinger took over Kovatch's sales meetings, and McFarland interfered with one of Kovatch's trainees. Also, Aldinger asked Kovatch if Kovatch had a lisp or a speech impediment. Aldinger would also ask Kovatch about whom he was dating, whether he had a child, and whether he slept with any female employees at CCMC. Aldinger bragged about having slept with women employees at CCMC and claimed he was responsible for women he had dated having three abortions.

Also at some point, Rapp began looking away when saying "hello" to Kovatch and would not shake Kovatch's hand. Rapp asked Kovatch questions about whom he was dating and gave Kovatch a birthday card with imprints of a kiss on it and the message "Where do you want it?" printed on the inside.

On October 8, Aldinger informed Kovatch that Rapp and Aldinger had had a long conversation about getting rid of Kovatch. Aldinger added: "I

don't know what you do in your personal life, but I know you don't like the girls in the office." He also told Kovatch that Kovatch "might want to start looking for another job." On October 13, Kovatch went to the doctor complaining of various stress-related symptoms.

On October 19, Aldinger informed Kovatch that Aldinger was going to sit with the sales representatives, which Kovatch contends further interfered with his job performance. Aldinger also informed Kovatch that if Kovatch wanted to speak to Aldinger "to let him know by voicemail." Aldinger continued to refuse to acknowledge Kovatch when Kovatch said "hello."

On November 3, Kovatch sought psychotherapy treatment from a counselor, complaining of anxiety from what he perceived to be discrimination at work based on his sexual orientation. On November 9 or 10, Aldinger informed Kovatch that Kovatch would no longer do the interviewing and that instead Aldinger would decide who would be hired. Kovatch became very upset and told Aldinger, "I think that this is bullshit." When Kovatch told Aldinger that he was going to go to Rapp or to human resources, Aldinger replied: "Let me make something loud and clear to you, Dan. I don't like you. You're a faggot, and there is no place for faggots in this company. And when Paul [Rapp] and I meet with you tomorrow, you're fired."

 We believe the foregoing evidence is sufficient to create a triable issue of fact as to whether a reasonable employee in Kovatch's position would have found the conditions in CCMC's San Diego office intolerable because of harassment on the basis of sexual orientation. Accepting Kovatch's evidence as true, a trier of fact could reasonably infer from that evidence that Aldinger harbored antigay sentiments, that he disliked Kovatch because Kovatch was gay, and that he was determined to end Kovatch's employment because of Kovatch's sexual orientation. Aldinger referred to homosexuals in derogatory terms on several occasions in Kovatch's pres-. ence. Moreover, the evidence can be reasonably interpreted to suggest that because Kovatch was gay, Aldinger ostracized Kovatch, systematically took away his job responsibilities, and ultimately threatened Kovatch with termination. In our view, whether a reasonable employee would have found working under Aldinger's supervision intolerable given those circumstances is not a question amenable to resolution on summary judgment.

Defendants argue that Kovatch failed to show a "continuous pattern" of discrimination sufficient to create an intolerable working environment. However, in so arguing, defendants ignore all of the incidents identified by Kovatch except those in which Aldinger referred to homosexuals using

derogatory terms. Our consideration of Kovatch's evidence is not so limited. While some of Aldinger's behavior toward Kovatch may not on its face evidence any bias on the basis of Kovatch's sexual orientation, an inference of bias would not be unreasonable based on those incidents in which Aldinger did display antigay animus. (See *Anthony* v. *County of Sacramento* (E.D.Cal. 1995) 898 F.Supp. 1435, 1449 & fn. 26.) Viewed in its entirety, Kovatch's evidence is sufficient to give rise to triable questions of fact as to whether Aldinger's apparent hostility toward Kovatch was motivated by Kovatch's sexual orientation and whether a reasonable person in Kovatch's position would have found Aldinger's behavior intolerable.

Defendants argue that once CCMC was finally notified of Kovatch's concerns regarding sexual orientation discrimination in the San Diego office, "CCMC provided [Kovatch] immediate support if he wanted to work in San Diego, an alternative job if he wanted to stay in West Hollywood, and assurances of non discrimination." In effect, defendants suggest CCMC cannot be held liable for constructive discharge because it remedied the allegedly intolerable conditions of which Kovatch complained. We conclude, however, that the adequacy of CCMC's response to Kovatch's complaint of discriminatory treatment presents a triable issue of fact for the jury. Ultimately, the question is whether, given the totality of the circumstances, the conditions with which Kovatch was presented at the end of his disability leave left him no reasonable choice but to refuse to return to work for CCMC. On this record, we cannot answer that question as a matter of law.

As noted above, after learning in late January 1994 that Kovatch had filed a complaint for sexual orientation discrimination with the Labor Commission, CCMC conducted an investigation into Kovatch's allegations. In a letter dated January 31, 1994, Jones wrote to the discrimination complaint investigator regarding the results of that investigation, as follows: "Our investigation of Mr. Kovatch's complaint has not found any corroborating evidence or witnesses; we will investigate this matter further if more specific information is provided. Since this matter has come to our attention, steps have been taken with local management to assure that no conduct that may be perceived as offensive is occurring in the workplace." Jones did not explain in her letter what those "steps" were, nor is there any evidence in the record to indicate what, if any, actions CCMC had taken with regard to the San Diego office.

As previously noted, on February 2 Kovatch sent a memo to CCMC elaborating on his complaints about Aldinger's treatment of him. In that memo, Kovatch requested, among other things, a description of the meeting that was supposed to occur in early November between Kovatch, Rapp, and

Aldinger. On February 3, Jones apparently spoke with Kovatch by telephone, informing him that she would look into the matters raised in his memo. Kovatch faxed a note to Jones on February 7, reiterating the requests contained in his February 2 memo. Jones responded in a letter dated February 9, in which she explained that "[t]he purpose of the luncheon meeting was to conduct a 'developmental counseling session' with you and to set up a training plan. There was no intention to terminate your employment from CCMC." Jones stated again that she was looking into the matters raised in his February 2 memo and she hoped they could talk soon.

The anticipated conversation took place approximately two weeks later, on February 25. In a declaration submitted in support of the motion for summary judgment, Jones described the conversation as follows: "We discussed the items he raised in his February 2, 1994 memorandum. After we discussed his allegations, we discussed whether he wanted to return to work, whether he wanted to work in a different office or whether he had another option in mind. Mr. Kovatch told me that he would not return to the San Diego branch." At his deposition, Kovatch described the conversation slightly differently. According to Kovatch, after discussing the matters raised in his February 2 memo, Jones asked him, "What is it you're looking for? Is it a monetary figure?" Kovatch described the remainder of the conversation as follows:

"She said, 'Would you want to work'—she asked me, 'Do you still want to work for the company?'

"I said, 'Yes. It would depend.'

"And she said, 'Well'—

"I said, 'I don't want to work for Dean Aldinger.'

"She said, 'Well, what we can do is maybe find you another position.'

"And I said, 'That would'—I said, 'That would be nice.'

"And she said, 'In a different office.'

"And I said, 'That would be nice.'

"She said, 'Would you be willing to take a position maybe out in Glendale?'

"And I said, 'What type of position?'

"And she said, 'Well, would you be willing to take a sales representative position out in Glendale?'

"And I said, 'Well'—um, actually, her exact words, 'Would you be willing to take a demoted sales representative position?'

"And I said, 'Would the salary be similar?'

"And she said, 'I have to be honest, Dan. If—if you're going to take a demoted position into a sales representative position, then naturally you're going to have to take a cut in salary and you'd be working at the sales representative salary.'

"And at that point, I had said—I had said, 'No' at that point.

"And, um, then she said—she said 'You're out on leave.'

"And I said, 'What about workers' comp.?'

"She said, 'Well, you can't file for workers comp.'

"And then I got really concerned and it pretty much—I just said, 'Well, you know, we'll have to be—I'll be in touch with you. Or you can call me at any time.' "

Three days after that conversation, Jones sent a follow-up letter to Kovatch, in which wrote:

". . . You indicated that you would not be interested in returning to work in the San Diego branch office. Accordingly, we will take steps to fill that position.

". . . . . . . . . . . . . . . . . . . . . .

"As we have discussed, our objective is to provide a work environment which is free from discrimination or retaliation. I have spoken with several employees in the sales unit in San Diego, and have thus far not found corroborating evidence to support your allegations of differential treatment or hostile work environment while you worked in that office.

"I will continue to investigate the concerns you have raised. Whether or not we find any corroborating information, we will monitor your concerns. If you decide to seek a return to an available position, your work environment would be free from any harassment or retaliation. If you have additional information you want me to consider, don't hesitate to contact me."

As noted above, CCMC filled the San Diego sales supervisor position less than two weeks later, on March 11.

The foregoing evidence does not establish that CCMC engaged in remedial actions which, as a matter of law, were sufficient to avoid any liability for the constructive discharge of Kovatch. There is no evidence CCMC offered to do anything to ensure that if Kovatch returned to the San Diego office he would be protected from harassment by Aldinger. At oral argument before this court, counsel for defendants argued that CCMC told Kovatch that if he returned to the San Diego office, CCMC would make sure that he did not have a discriminatory environment. There is no support for that argument in the record. While Jones did assure Kovatch in her letter of February 25 that his "work environment would be free from any harassment or retaliation," she made that assurance only after she informed Kovatch that CCMC would be taking steps to fill the sales supervisor position in San Diego. Under these circumstances, we cannot say as a matter of law that CCMC remedied any intolerable conditions Kovatch may have faced in the San Diego office. If the jury finds that Aldinger's treatment of Kovatch would have been intolerable to a reasonable employee, then it will be for the jury to decide whether CCMC's purported remedial actions were sufficient to avoid any liability for the constructive discharge of Kovatch.

Furthermore, we cannot say as a matter of law that CCMC's offer of a sales representative position in the Glendale office was by itself sufficient to avoid liability for constructive discharge. Defendant contends Kovatch could make more money as a sales representative than as a sales supervisor; however, that fact is not dispositive, especially given the evidence that Kovatch's goal was to become a sales manager. In *Turner* v. *Anheuser-Busch, Inc.*, *supra*, 7 Cal.4th at page 1247, the California Supreme Court observed that "a demotion . . . does not by itself trigger a constructive discharge." However, more recently the court explained that "*Turner* did not hold . . . that a demotion can never be the basis for a wrongful termination." (*Scott* v. *Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 468, fn. 3 [46 Cal.Rptr.2d 427, 904 P.2d 834].) If the jury finds that returning to the San Diego office was not a reasonable option for Kovatch, then it will be for the jury to decide, under the totality of the circumstances, whether a reasonable employee would have accepted a demotion rather than refuse to return to CCMC altogether. We cannot say that giving an employee the choice between returning to an environment of harassment or accepting a demotion is sufficient as a matter of law to avoid a claim of constructive discharge.

To the extent defendants suggest Kovatch cannot recover as matter of law because he "abandoned his job" to run for the city council position in West

Hollywood, we disagree. Kovatch offered evidence that he would have returned to work for CCMC under the proper circumstances notwithstanding his political campaign. Thus, it is a question for the jury whether Kovatch's campaign for city council was inconsistent with an intent to return to work for CCMC.

In conclusion, we find the evidence proffered by Kovatch sufficient to create triable issues of fact as to whether he was constructively terminated from his employment at CCMC as a result of harassment in violation of the fundamental public policy against sexual orientation discrimination in employment. Accordingly, the trial court erred in entering summary judgment against Kovatch on his cause of action for wrongful termination in violation of public policy.

## III

### At-will Employment

■ Generally, the existence of an implied-in-fact contract requiring good cause for termination is a question for the trier of fact; however, if only one reasonable conclusion can be drawn from the undisputed facts, the issue may be decided as a matter of law on summary judgment. (*Davis* v. *Consolidated Freightways* (1994) 29 Cal.App.4th 354, 366 [34 Cal.Rptr.2d 438]; *Miller* v. *Pepsi-Cola Bottling Co.* (1989) 210 Cal.App.3d 1554, 1557-1559 [259 Cal.Rptr. 56].) ■ Here, Kovatch contends there was a triable issue of fact as to whether his employment for CCMC was at will or terminable only for cause. For the reasons that follow, we disagree.

We begin with the applicable statutory law, found in the Labor Code: "An employment, having no specified term, may be terminated at the will of either party on notice to the other." (Lab. Code, § 2922.) ■ "Labor Code section 2922 establishes a presumption of at-will employment if the parties have made no express oral or written agreement specifying the length of employment or the grounds for termination. This presumption may, however, be overcome by evidence that despite the absence of a specified term, the parties agreed that the employer's power to terminate would be limited in some way, e.g., by a requirement that termination be based only on 'good cause.' [Citations.]" (*Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 677 [254 Cal.Rptr. 211, 765 P.2d 373].) "In the employment context, factors apart from consideration and express terms may be used to ascertain the existence and content of an employment agreement, including 'the personnel policies or practices of the employer, the employee's longevity of service, actions or communications by the employer reflecting assurances of continued employment, and the practices of the industry in which

the employee is engaged.' " (*Id.* at p. 680, quoting *Pugh* v. *See's Candies, Inc.* (1981) 116 Cal.App.3d 311, 327 [171 Cal.Rptr. 917].)

As the parties seeking summary judgment, defendants had the initial burden of proving Kovatch was an at-will employee. (See Code Civ. Proc., § 437c, subd. (o)(2).) To meet that burden, defendants relied on the presumption of at-will employment established by Labor Code section 2922. In addition, defendants offered evidence that in applying for employment with CCMC, Kovatch agreed his employment could be terminated "with or without cause, at any time, at the option of either the Company or myself." Defendants also offered evidence that CCMC's employee handbook, which Kovatch acknowledged receiving, provided for termination "at any time and for any reason."

Because defendants' evidence was sufficient to prove Kovatch was an at-will employee, the burden shifted to Kovatch to show the existence of a triable issue of fact as to his employment status. (See Code Civ. Proc., § 437c, subd. (o)(2).) Kovatch offered evidence that throughout his five years of employment with CCMC, he had received positive performance reviews, commendations from his superiors, and salary increases. He also offered evidence of various statements made to him over the years by various supervisory employees in which they allegedly assured him he had a future with the company and undoubtedly would become a sales manager.

■■■ In our view, Kovatch's evidence of positive performance reviews, commendations, salary increases, and vague assurances that he would become a sales manager was not sufficient to create a triable issue of fact as to whether the parties had implicitly agreed CCMC's right to terminate Kovatch would be limited. Most of those factors are "natural occurrences of an employee who remains with an employer for a substantial length of time." (*Miller* v. *Pepsi-Cola Bottling Co.*, *supra*, 210 Cal.App.3d at p. 1559.)

As noted above, in applying for employment, Kovatch expressly agreed that his employment could be terminated without cause at any time. Citing *Harden* v. *Maybelline Sales Corp.* (1991) 230 Cal.App.3d 1550 [282 Cal.Rptr. 96], Kovatch contends an employment application is a "mere solicitation of an offer of employment" and not a binding contract. Even if that is so, the at-will language in the application still constitutes "evidence concerning the ultimate agreement entered into between the parties." (*Id.* at p. 1556.)

Kovatch argues that the noncompetition agreement he signed raises a triable issue of fact as to whether his employment was terminable only for

cause. However, that agreement is the same one in which Kovatch agreed to accept employment subject to the terms and conditions contained in CCMC's employment handbook, which, as previously noted, contained an at-will employment clause. Thus, that agreement merely reinforces the at-will nature of Kovatch's employment.

Because Kovatch failed to raise a triable issue of fact as to the at-will nature of his employment with CCMC, the trial court acted properly in entering summary judgment on Kovatch's claim for breach of contract.

## IV

### *Intentional Infliction of Emotional Distress*

■ Defendants contend the trial court properly granted summary judgment as to Kovatch's cause of action for intentional infliction of emotional distress because workers' compensation is Kovatch's sole remedy for his emotional distress and because CCMC's conduct was not extreme and outrageous. We disagree.

■ The California Supreme Court has held that ". . . injuries arising from termination of employment ordinarily arise out of and occur in the course of the employment" and are thus generally subject to the exclusive remedy provisions of the Workers' Compensation Act. (*Shoemaker* v. *Myers* (1990) 52 Cal.3d 1, 19-20 [276 Cal.Rptr. 303, 801 P.2d 1054, 20 A.L.R.5th 1016].) That limitation does not apply, however, when the "injury is a result of conduct, whether in the form of discharge or otherwise, not seen as reasonably coming within the compensation bargain." (*Id.* at p. 20.) In such cases, "a separate civil action may lie." (*Ibid.*)

A claim for wrongful termination in violation of public policy is one type of claim that is not barred by the exclusive remedy provisions of the Workers' Compensation Act. (*Shoemaker* v. *Myers* (1992) 2 Cal.App.4th 1407, 1416-1419 [4 Cal.Rptr.2d 203].) "[W]here an employer's conduct implicates considerations of substantial public policy, interests beyond those of the employer and employee are involved. These interests are not protected by workers' compensation law and therefore must be accommodated outside the compensation bargain." (*Id.* at pp. 1418-1419.)

■ Here, in pleading his claim for intentional infliction of emotional distress, Kovatch incorporated by reference all of the allegations of his previous causes of action. Thus, Kovatch's emotional distress claim is premised on the same conduct as his claim for wrongful termination in

violation of public policy. It follows that, like his wrongful termination claim, Kovatch's emotional distress claim is not barred by the exclusive remedy provisions of the Workers' Compensation Act.

 One of the elements of a cause of action for intentional infliction of emotional distress is "outrageous conduct." (*Fisher* v. *San Pedro Peninsula Hospital, supra,* 214 Cal.App.3d at p. 617.) In *Fisher,* the court held that ". . . by its very nature, sexual harassment in the work place is outrageous conduct as it exceeds all bounds of decency usually tolerated by a decent society. [¶] Accordingly, if properly pled, sexual harassment will constitute the outrageous behavior element of a cause of action for intentional infliction of emotional distress . . . ." (*Id.* at p. 618.) We hold that the same is true of harassment based on sexual orientation. Because Kovatch's evidence was sufficient to create a triable issue of fact as to whether a reasonable person would have found working conditions at CCMC's San Diego office intolerable, it was also sufficient to create a triable issue as to whether the conduct Kovatch experienced was outrageous. Accordingly, the trial court erred in granting summary judgment on Kovatch's cause of action for intentional infliction of emotional distress.

### DISPOSITION

The judgment is reversed on Kovatch's causes of action for wrongful termination in violation of public policy and intentional infliction of emotional distress. The judgment is affirmed on Kovatch's cause of action for breach of contract. Respondents to bear costs on appeal.

Huffman, Acting P. J., and McIntyre, J., concurred.

Respondents' petition for review by the Supreme Court was denied October 14, 1998.