Filed 2/14/14  Migliore v. Nu Flow Holdings CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| JOHN A. MIGLIORE,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>NU FLOW HOLDINGS, INC. et al.,<br><br>    Defendants and Respondents. | D061109<br><br><br><br>(Super. Ct. No. 37-2008-00094969-CU-WT-CTL) |


APPEAL from a judgment of the Superior Court of San Diego County, Joel M. Pressman, Judge.  Affirmed.


Robert R. Massey for Plaintiff and Appellant.

Higgs, Fletcher & Mack, John Morris, Victoria E. Fuller, Paul J. Pfingst for Defendants and Respondents.


Plaintiff and appellant John A. Migliore, an attorney, sued his former employer, defendants and respondents Nu Flow Holdings, Inc., Nu Flow America, Inc., and Nu

Flow Technologies (2000), Inc. as well as Nu Flow principals Cameron Manners and Steve Howe (collectively Nu Flow) for wrongful termination and other causes of action, alleging Nu Flow failed to give him promised stock and forced his resignation. After the trial court granted nonsuit on Migliore's causes of action for breach of employment contract/constructive discharge and breach of the implied covenant of good faith and fair dealing, the jury returned a special verdict in Nu Flow's favor on Migliore's remaining causes of action for breach of oral contract and fraud. Migliore appeals from the judgment, contending the trial court erred by (1) granting Nu Flow's motion for nonsuit; (2) excluding Migliore's testimony relating to the accuracy of his deposition testimony; and (3) ordering Migliore to modify his proposed special verdict form. Migliore argues the court's errors, even if independently harmless, were cumulatively prejudicial. We affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND[1]

In 2005, Nu Flow America, Inc. hired Migliore as its full-time in-house counsel, primarily to oversee anticipated litigation with one of Nu Flow's competitors, Ace DuraFlo. At the time, Migliore was a private civil practitioner who had previously done legal work for Nu Flow America, Inc, Nu Flow Technologies (2000), Inc. and some

---

[1]     Migliore's claims of breach of oral contract and fraud were the subject of conflicting trial testimony. Because Migliore does not challenge the sufficiency of the evidence to support the jury's special verdicts in Nu Flow's favor, we are entitled to state the facts in the light most favorable to those verdicts, resolving all conflicts and indulging all reasonable inferences to support the judgment. (*Green Wood Industrial Co. v. Forceman Intern. Development Group, Inc.* (2007) 156 Cal.App.4th 766, 770, fn. 2; *Blanks v. Seyfarth Shaw LLP* (2009) 171 Cal.App.4th 336, 346, fn. 2.)

2

Howe family members.  Manners and Howe, respectively Nu Flow's chief executive officer and executive vice-president, discussed Migliore's benefits and agreed he was to receive a yearly salary of $175,000. At the time he was hired, Migliore's terms of compensation were not set out in writing.  The remaining terms of Migliore's employment were subject to conflicting trial testimony.  According to Howe, he and Migliore negotiated a deal in which Migliore would receive a 2.5 percent interest in the company, in some form of trading media.  Migliore asserted he requested 2.5 percent ownership of the company and Manners and Howe agreed, telling him that when they formed Nu Flow Holdings, Inc. he would get actual stock, not stock options.  Migliore testified he understood he would get the stock and "wouldn't have to do anything else." He claimed Manners and Howe knew he had closed his office based on that understanding.

By 2006, Nu Flow was defending potentially company-ending litigation with Ace DuraFlo and taking in investors to fund Nu Flow's growth as well as the litigation.  In October 2006, Nu Flow approved a stock option plan for employees, including Migliore, who was designated to receive an option for 250,000 common shares of Nu Flow Holdings, Inc.  Migliore had helped prepare the document creating the new stock (a share purchase agreement) and signed an opinion letter regarding its provisions.  However, he believed he had an oral contract with Manners and Howe that he would receive 2.5 percent of the company in "non-dilutable" shares.  Though he stated that contract was created as of January 2007, Migliore did not document that agreement in January, February or March 2007, and he never confirmed or recorded the agreement in writing.

3

In April 2007, Migliore was granted 250,000 fully vested stock options in Nu Flow Holdings, Inc. at an exercise price of $1.70. At the time, that was equivalent to 2.5 percent of the total outstanding shares of the business. Migliore did not protest or file anything in writing during his employment or up to the time of trial stating that that was not their agreement.

Migliore and other Nu Flow employees eventually became aware they would be signing an acknowledgement of receipt of an employee handbook. In August 2007, Migliore signed the acknowledgement, entitled "Receipt of Employee Handbook and Employment At-Will Statement" (some capitalization omitted), which stated in part: "I . . . understand that no department head, supervisor, or any other employee of Nu Flow America, except the board of directors, has the authority to enter into any agreement for employment for any specified period of time or to make any agreement contrary to the at-will relationship described above. I acknowledge that Nu Flow America may modify or rescind any policies, practices or benefits described in the Employee Handbook, other than the employment at-will policy, at any time without prior notice to me. [¶] I understand and agree that my employment with Nu Flow America is at-will, and can be terminated with or without cause or notice. I further understand and agree that Nu Flow America retains sole discretion to modify the terms and conditions of employment. This is the entire agreement between Nu Flow America and me on these issues, and it cannot be modified except by a new agreement, in writing and signed by an officer of Nu Flow America."

4

In the summer of 2007, Manners was busy reporting to the board and preparing reports to investors, and dealing with the Ace DuraFlo litigation. In late September 2007, Manners and Howe left the country for a combined offsite investor meeting/vacation, and appointed Migliore vice-president of Nu Flow America, Inc. and Nu Flow Technologies 2000, Inc. Manners and Howe returned to the office in mid-October 2007. In late October 2007, a series of wildfires occurred in San Diego County, and Migliore did not work on October 22, 2007, or October 23, 2007. On October 25, 2007, approximately 30 files were transferred out of Nu Flow's legal department to its national sales manager. On October 28, 2007, Migliore e-mailed Manners and Howe asking them to finalize the paperwork on his stock. He wrote: "Although my options are already granted through all the previous paperwork on the subject, I would like to formalize everything, including our agreement in January that they would ultimately be at not [*sic*] cost to me." Manners did not recall getting the e-mail, which was sent via "Yahoo," and he testified such e-mails usually went into a spam file.

About a week later, Migliore handed Manners a letter of resignation stating that the attorney-client relationship had eroded over the past several months, and had so broken down Migliore was required to leave Nu Flow. He did not speak with Howe about his resignation beforehand and Howe did not know why Migliore left; Migliore and Howe did not speak again until Migliore sued Nu Flow. At the time, there were three Ace DuraFlo cases pending in two different courts and a pending summary judgment motion. Howe was required to substitute new counsel into the Ace DuraFlo litigation.

5

Migliore sued Nu Flow in October 2008, and weeks later filed a first amended complaint alleging causes of action for age discrimination, breach of contract/constructive termination, negligent and intentional interference with economic relationship, breach of the covenant of good faith and fair dealing, unjust enrichment, and fraud. In part, Migliore alleged that as consideration for him giving up his practice, Nu Flow offered him a salary and an approximately two-to-three percent shareholder interest in the company. He further alleged that in January 2007, Nu Flow confirmed his entitlement to 250,000 shares of stock at no out-of-pocket cost to him, but as part of the compensation package as an inducement to leave his practice and for his continued employment with Nu Flow. In his second cause of action for "breach of employment contract/constructive termination," Migliore alleged "Nu Flow constructively terminated [his] employment arbitrarily, capriciously and without just cause. Nu Flow accomplished this constructive termination by taking away the tools with which Migliore was to perform his duties—his files, as alleged above . . . and stopped communicating with him. Nu Flow has breached its contract of employment with Migliore. Said breach has caused damage to plaintiff in that he has been deprived of the benefits of his employment agreement, including the ongoing salary, insurance benefits, plus periodic pay raises and bonuses, and including the stock he was promised." (Some capitalization omitted.) The matter proceeded to a jury trial after Migliore dismissed his claims for age discrimination and unjust enrichment.

Trial in Migliore's action began in August 2011 on the operative pleading, Migliore's first amended complaint. After the close of Migliore's case, Nu Flow orally

6

moved for nonsuit. During arguments on the motion, Migliore's counsel argued he had pleaded and proved that Migliore's termination violated public policy. Nu Flow's counsel responded by pointing out Nu Flow had been sued in contract, not tort; counsel argued Migliore had in any event not proven any such claim. The trial court, reasoning Migliore's employment was at-will and integrated into the written contract, entered nonsuit on Migliore's second cause of action for breach of contract/constructive discharge, third and fourth causes of action for negligent and intentional interference with economic relationship, and fifth cause of action for breach of the implied covenant of good faith and fair dealing.[2]

The next day, Migliore filed a second amended complaint including causes of action for fraud and breach of an oral contract to give Migliore 2.5 percent of Nu Flow Holdings, Inc. in the form of stock. The case went to the jury only on Migliore's causes of action for breach of oral contract, intentional misrepresentation and negligent misrepresentation. After Nu Flow completed its case, the jury returned a special verdict in Nu Flow's favor. The court entered judgment accordingly.

---

[2] Following counsel's arguments on the nonsuit motion, the court stated: "Well, I'll tell you that based upon the—the evidence that has been presented, it is clear to this court that at all times, this was an at-will employment, and it was integrated into the written contract. And that's clear. [¶] And the tortious aspect of the breach of employment contract, constructive termination—there has not been any evidence that's credible to this court or to any trier of fact that would move this case forward to jury. . . . The allegations that have been made relative to the promise of stock or stock option have been raised but certainly have not met this court's burden of proof to move forward. I think that counsel is correct. And I have read the—I believe it's the *Haggard* [*v. Kimberly Quality Care, Inc.* (1995) 39 Cal.App.4th 508 (*Haggard*)] case. . . . [¶] . . . And this case is on all fours with that."

7

Migliore appeals from the judgment.

## DISCUSSION

### I. *Migliore's Claim for Constructive Discharge in Violation of Public Policy*

Migliore contends the trial court erred by granting Nu Flow's motion for nonsuit on his claim for constructive discharge. Migliore does not recite the evidence in his favor on this point, he merely summarizes the trial court's reasoning, seeks to distinguish *Haggard*, *supra*, 39 Cal.App.4th 508 on which the court relied in its ruling, and argues the court usurped the role of the jury.[3] Migliore further argues that Nu Flow violated two public policy interests that "preempt" the at-will nature of his employment, namely, Nu Flow assertedly (1) placed him in a position where he was required to resign or else violate California State Bar Rules of Professional Conduct (rule references are to these rules) and (2) forced him out to avoid issuing him his promised stock.

---

[3] We reject Migliore's cursory argument that the court usurped the jury's function. He maintains that because the terms of "the contract" were in dispute, presumably referring to his oral employment contract, the determination of the contract's terms and their meaning was a question of fact rather than law. For this proposition, which is not further explained, Migliore cites *Warner Construction Corp. v. City of Los Angeles* (1970) 2 Cal.3d 285 and *Aronowicz v. Nalley's, Inc.* (1972) 30 Cal.App.3d 27, 49-50, neither of which involve employment contracts. In *Warner Construction*, the court explained that if the interpretation of a contract depends on the credibility of extrinsic evidence, the question of credibility is properly for the jury. (*Warner Construction*, 2 Cal.3d at p. 291.) In *Aronowicz*, the parties had presented conflicting evidence as the meaning of a termination clause in a distribution agreement, and the Court of Appeal held it was proper for the clause's meaning to be the subject of testimony and for the jury to decide whether the agreement was properly terminated. (*Aronowicz*, 30 Cal.App.3d at pp. 49-51.) In connection with this argument, Migliore does not describe what conflicting extrinsic evidence should have been presented to the jury as to the terms of his employment. Nor does Migliore explain the relevance or consequence of the jury's determination that the parties did not enter into an oral contract for the promise of stock. We do not address the contention further.

8

In response, Nu Flow points out that Migliore had asserted only contract claims based on a theory of constructive discharge, not tort claims for wrongful discharge in violation of public policy. It acknowledges that Migliore had submitted a second amended complaint including such a cause of action, but points out the trial court found there was no "credible" evidence to support it. Nu Flow characterizes the trial court's ruling as not granting nonsuit on that cause of action, but denying *leave to amend* to assert it, requiring us to apply a deferential abuse of discretion standard.

We agree with Nu Flow that the trial court's order must be reviewed for abuse of discretion. The court's later comments reveal that it permitted Migliore to file a second amended complaint only to "track what the evidence showed." Thus, the order in effect denied Migliore's midtrial request to amend to conform to proof so as to set forth a cause of action for wrongful constructive discharge in violation of public policy, a decision we review for abuse of discretion. (Code Civ. Proc., § 473, subd. (a)(1); *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31; *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1378.) It is immaterial that the court stated there was no credible evidence to support such a claim; we review the correctness of a trial court's result, not its rationale. (*Howard v. Thrifty Drug & Discount Stores* (1995) 10 Cal.4th 424, 443; [" 'We uphold judgments if they are correct for any reason, "regardless of the correctness of the grounds upon which the court reached its conclusion." ' "]; *Davey v. Southern Pacific Co.* (1897) 116 Cal. 325, 329 ["[A] ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason."].)

9

" ' "[T]he allowance of amendments to conform to the proof rests largely in the discretion of the trial court and its determination will not be disturbed on appeal unless it clearly appears that such discretion has been abused. . . . Such amendments have been allowed with great liberality 'and no abuse of discretion is shown unless by permitting the amendment *new and substantially different issues are introduced in the case or the rights of the adverse party prejudiced . . . .' . . ."* Conversely, " 'amendments of pleadings to conform to the proofs should not be allowed when they *raise new issues not included in the original pleadings* and upon which the adverse party had *no opportunity to defend . . . .'* " ' " (*Duchrow v. Forrest, supra*, 215 Cal.App.4th at p. 1378.)

" ' "The cases on amending pleadings during trial suggest trial courts should be guided by two general principles: (1) whether facts or legal theories are being changed and (2) whether the opposing party will be prejudiced by the proposed amendment. Frequently, each principle represents a different side of the same coin: If new facts are being alleged, prejudice may easily result because of the inability of the other party to investigate the validity of the factual allegations while engaged in trial or to call rebuttal witnesses. If the same set of facts supports merely a different theory . . . no prejudice can result." . . . "The basic rule applicable to amendments to conform to proof is that the amended pleading must be based upon the same general set of facts as those upon which the cause of action or defense as originally pleaded was grounded." ' " (*Duchrow v. Forrest, supra*, 215 Cal.App.4th at p. 1378.)

"[I]n ruling on a motion to amend a complaint to conform to proof, 'the court is usually guided by whether: [¶] . . . there is a *reasonable excuse* for the delay . . . ; [¶] . . . the change relates to the *facts* or only to legal theories; and [¶] . . . the opposing party will be *prejudiced* by the amendment.' " (*Duchrow v. Forrest*, *supra*, 215 Cal.App.4th at pp. 1378-1379.)

The trial court's decision was not a manifest abuse of its broad discretion for several reasons. First, Migliore, who originally filed his first amended complaint in November 2008, waited until August 24, 2011, to present his second amended complaint, well over two and one-half years later, on the fourth day of an approximately four and a half-day jury trial.[4] We acknowledge that "[c]ourts must apply a policy of liberality in permitting amendments at any stage of the proceeding, including during trial, when no prejudice to the opposing party is shown. [Citation.] 'However, " 'even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial.' " ' " (*P&D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345; see also *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 488 ["Where the trial date is set, the jury is about to be impaneled, counsel, the parties, the trial court, and the witnesses have blocked the time, and the only way to avoid prejudice to the opposing party is to continue the trial date to allow further discovery, refusal of leave to amend cannot be an abuse of discretion."].) As in *Duchrow*

---

4     The court ruled on pretrial evidentiary motions on August 16, 2011, and the actual commencement of trial was August 17, 2011. (Evid. Code, § 12, subd. (b)(1) [commencement of trial when "the first witness is sworn or the first exhibit is admitted into evidence"].) Trial took place on August 17, 18, 22 (for a half day), 23 and 24.

11

*v. Forrest*, *supra*, 215 Cal.App.4th at page 1379, in which the plaintiff waited more than two years to amend his complaint to change the theory of liability, and did so on the fourth day of a five-day trial, Migliore's amendment was offered after a long unexplained delay, and with lack of diligence. On that ground alone, the court did not err in its ruling.

Second, Migliore's asserted public policy-based cause of action required Migliore to change his theory from a contract breach to a tort, requiring him to demonstrate that Manners or Howe were on notice that they were violating a public policy that was delineated in constitutional or statutory provisions. (*Silo v. CHW Med. Found.* (2002) 27 Cal.4th 1097, 1104.)[5] And, Migliore was required to prove the policy was " ' "public" in that it "affects society at large" rather than the individual, . . . articulated at the time of

_____

[5] "Apart from the terms of an express or implied employment contract, an employer has no right to terminate employment for a reason that contravenes fundamental public policy as expressed in a constitutional or statutory provision. [Citation.] An actual or constructive discharge in violation of fundamental public policy gives rise to a tort action in favor of the terminated employee." (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252 (*Turner*), overruled on another ground in *Romano v. Rockwell Internat., Inc.* (1996) 14 Cal.4th 479, 498.) In *Silo v. CHW Med. Found.*, *supra*, 27 Cal.4th 1097, our high court explained the foundations of the public policy-based exception to the at-will employment rule: " '[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy.' [Citations.] We have held that this public policy exception to the at-will employment rule must be based on policies 'carefully tethered to fundamental policies that are delineated in constitutional or statutory provisions . . . .' [Citation.] This requirement 'grew from our belief that " 'public policy' as a concept is notoriously resistant to precise definition, and that courts should venture into this area, if at all, with great care and due deference to the judgment of the legislative branch" in order to avoid judicial policymaking.' [Citation.] It also serves the function of ensuring that employers are on notice concerning the public policies they are charged with violating. 'The employer is bound, at a minimum, to know the fundamental public policies of the state and nation as expressed in their constitutions and statutes . . . .' " (*Id.* at p. 1104.)

12

discharge, and . . ." 'fundamental' " and " 'substantial.' " ' " (*Ibid*.; *Ross v. RagingWire Telecommunications, Inc.* (2008) 42 Cal.4th 920, 942.)

But Migliore never pleaded the statutory or constitutional public policy bases for these claims, and the amendment would have involved factual determinations that were not included in the original pleadings. Thus, allowing Migliore to amend would have eliminated Nu Flow's opportunity to adequately defend the allegation that such rule violations occurred, or prove the policies asserted were not predicated on duties that would benefit the public at large. (Accord, *Duchrow v. Forrest*, *supra*, 215 Cal.App.4th at p. 1380 [amendment during trial improper where " ' "new and substantially different issues [were] introduced in the case" ' "].)

For example, to support his theory of wrongful constructive discharge to avoid violating attorney rules of professional conduct, Migliore seeks to argue that the rules of professional conduct, which bind all attorneys, required him to terminate his employment with Nu Flow. Specifically, Migliore points to rule 3-700(B)(2), under which an attorney who represents a client in one matter shall withdraw from that employment, if the attorney "knows or should know that continued employment will result in violation of these rules," and rule 3-500, which requires an attorney to "keep a client reasonably informed about significant developments relating to the employment or representation, including promptly complying with reasonable requests for information and copies of significant documents when necessary to keep the client so informed." According to Migliore, these provisions were violated by evidence he was "completely ignored" by Nu Flow, "essentially leading to a refusal on Defendants' part to communicate with [him] in

13

any fashion" due to his repeated requests that Nu Flow grant him his 2.5 percent stock ownership interest. He argues that for him to stay on as Nu Flow's general counsel, he would have been put in the position of having to violate ethical mandates as it was "impossible" for him to keep his client reasonably informed of Nu Flow's ongoing business. Migliore has not shown Nu Flow was given the opportunity to conduct discovery on, or rebut, such allegations before trial.

Even had the trial court permitted Migliore to amend his complaint, but granted a nonsuit on such a claim, we would uphold it on the ground the policy on which Migliore relied, ethical standards requiring an attorney to keep his or her client reasonably informed, is predicated on a duty inuring to the individual client, not one that would benefit the public at large. Nothing in Migliore's cited authority—*General Dynamics Corp. v. Superior Court* (1994) 7 Cal.4th 1164—holds to the contrary. The court in *General Dynamics*, reviewing a demurrer sustained without leave to amend, merely issued a limited holding: that an in-house counsel may maintain a retaliatory discharge claim against his or her employer to the same extent as a nonattorney employee under circumscribed circumstances, including where the attorney insists on adhering to mandatory ethical norms or refuses to violate them. (*Id*. at pp. 1169, 1181-1182, 1189-1192.) In doing so, the court emphasized that "[s]ome (*but not all*) . . . professional norms incorporate important public values." (*Id*. at p. 1181, italics omitted and added.) Specifically, the court stated "attorneys should be accorded a retaliatory discharge remedy in those instances in which *mandatory ethical norms* embodied in the Rules of Professional Conduct *collide with illegitimate demands of the employer* and the attorney

insists on *adhering to his or her clear professional duty*." (*Id*. at p. 1186.) The court specifically referred to counsel's duty to "not be a party to the commission of a crime, destroy evidence or suborn perjury." (*Ibid*.) An attorney's duty to keep his or her own client informed is not comparable.

As for Migliore's asserted public policy-based wrongful discharge cause of action relating to Nu Flow's asserted failure to pay him stock as wages,[6] Migliore contends he presented evidence that the assertedly promised 2.5 percent stock ownership interest qualified as wages under the relevant Labor Code provisions. According to Migliore, his circumstances are like those in *Schachter v. Citigroup* (2009) 47 Cal.4th 610. Migliore characterizes the California Supreme Court in *Schachter* as holding that restricted stocks constitute wages under the Labor Code. We disagree.

---

[6] "An employer who fails to pay an employee his or her wages, or engages in unlawful wage deductions, violates public policy." (*Sciborski v. Pacific Bell Directory* (2012) 205 Cal.App.4th 1152, 1174; see *Pineda v. Bank of America, N.A.* (2010) 50 Cal.4th 1389, 1400 [" '[T]he public policy in favor of full and prompt payment of an employee's earned wages is fundamental and well-established.' "]; *Henry M. Lee Law Corp. v. Superior Court* (2012) 204 Cal.App.4th 1375, 1388.) This court explained in *Sciborski*: "Labor Code section 221 prohibits an employer from deducting amounts from an employee's wages, even as a set-off for amounts clearly owed by the employee. [Citation.] This prohibition reflects 'California's strong public policy favoring the protection of employees' wages,' including amounts earned through commissions on sales. [Citation.] Labor Code section 221's rights are nonnegotiable and cannot be waived by the parties. [Citation.] 'By enacting [Labor Code] section 221 . . . the Legislature has prohibited employers from using self-help to take back any part of "wages theretofore paid" to the employee, except in very narrowly defined circumstances provided by statute.' " (*Sciborski*, 205 Cal.App.4th at p. 1166.) " ' "[W]ages" ' are defined to include 'all amounts for labor performed by employees . . . whether the amount is fixed or ascertained by the standard of time, task, piece, commission basis, or other method of calculation.' " (*Ibid*., quoting Lab. Code, § 200, italics omitted.)

15

*Schachter* involved a voluntary employee incentive compensation plan that awarded employees shares of restricted company stock at a reduced price " 'in lieu of cash payment of a percentage of the employee's annual compensation,' " which would only fully vest with the employee after two years. (*Schachter v. Citigroup*, *supra*, 47 Cal.4th at pp. 613, 614-615.) Employees who resigned or were terminated for cause before their restricted shares vested would forfeit the stock and that portion of cash compensation they directed be paid in the form of the stock. (*Id*. at pp. 613, 615.) The question considered by the California Supreme Court was whether that forfeiture provision violated Labor Code sections requiring employees be paid all earned, unpaid wages upon termination or resignation, and prohibiting agreements to the contrary. (*Ibid*.) It held the forfeiture provision did not violate the Labor Code because no earned, unpaid wages remained outstanding upon termination according to the terms of the incentive plan. (*Ibid*.) In *Schachter*, though the court construed the term wages broadly to include incentive compensation such as bonuses and profit-sharing plans (*id*. at p. 618), neither the plaintiff nor defendant in that case disputed that the cash compensation and the restricted stock constituted wages, and in dicta, the court agreed that "the shares of restricted stock issued to [plaintiff] also constituted a wage." (*Id*. at p. 619.)

Here, Migliore's purported cause of action required him to present evidence that he and Nu Flow reached an agreement not only to provide him stock, but that the stock was part of his compensation package. Any claim that Nu Flow violated a fundamental public policy in failing to issue stock as compensation would have to be premised on the jury finding that Nu Flow and Migliore reached such an agreement in the first place. But

16

in its special verdict, the jury answered "no" to the question: "Did . . . Migliore and Nuflow Holdings, Inc. enter into an oral contract for the promise of stock?" (Some capitalization omitted.)

Thus, Migliore cannot demonstrate prejudice, even assuming error. Migliore must affirmatively show prejudice resulting from an error by the trial court and demonstrate a reasonable probability of a more favorable outcome absent the error to justify reversal. (Cal. Const., art. VI, § 13; Code Civ. Proc., § 475; *People v. Watson* (1956) 46 Cal.2d 818, 836; *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 833.) In view of the jury's special verdict finding Migliore and Nu Flow did not enter into such a contract, Migliore cannot show he was prejudiced by any error of the trial court in either granting nonsuit on, or denying him leave to amend his complaint to state, a cause of action for constructive termination in violation of public policy for failing to issue stock as promised compensation.

II. *Nonsuit was Properly Granted in Any Event on Migliore's Cause of Action for Breach of Employment Contract/Constructive Discharge*

A. *Review Standards*

Code of Civil Procedure section 581c, permits a defendant to move for a judgment of nonsuit after the presentation of the plaintiff's evidence. (Code Civ. Proc., § 581c, subd. (a).) The motion is in effect a demurrer to the evidence; conceding the truth of the plaintiff's facts and arguing they are not sufficient as a matter of law to sustain his or her case. (*Alpert v. Villa Romano Homeowners Assn.* (2000) 81 Cal.App.4th 1320, 1328.)

17

" 'A defendant is entitled to nonsuit if the trial court determines the evidence presented by the plaintiff is insufficient as a matter of law to permit a jury to find in her favor. The court may not weigh the evidence or consider the credibility of witnesses. Instead, it must accept the evidence most favorable to the plaintiff as true and disregard conflicting evidence. The plaintiff's evidence must be given all the value to which it is legally entitled, including every legitimate inference that may be drawn in the plaintiff's favor. A mere "scintilla of evidence" is not enough, however. There must be substantial evidence creating a conflict for the jury to resolve. In reviewing a grant of nonsuit, we follow the same rules requiring the evidence to be evaluated in the light most favorable to the plaintiff and least favorable to the defendant. All presumptions, inferences, and doubts are resolved against the defendant. We may not affirm, unless judgment for the defendant is required as a matter of law.' " (*Allgoewer v. City of Tracy* (2012) 207 Cal.App.4th 755, 761.)

B. *Migliore's Employment Was At-Will As a Matter of Law*

"An at-will employment may be ended by either party 'at any time without cause,' for any or no reason, and subject to no procedure except the statutory requirement of notice." (*Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 335.) Here, there is no dispute that in August 2007, Migliore executed a writing stating that his employment with Nu Flow America was at will, and containing a provision that the document was to be the "entire agreement between Nu Flow America and [Migliore] on these issues" and could not be modified "except by a new agreement, in writing and signed by an officer of Nu Flow America."

18

Migliore concedes that he did not claim at trial (and he does not claim on appeal) that he had an implied in fact contract to terminate for good cause; he asserts his sole theory at trial was that he was constructively terminated in violation of public policy. In arguing nonsuit was inappropriate on that claim, Migliore argues that, unlike the plaintiff in *Haggard*, *supra*, 39 Cal.App.4th 508, he had no written employment agreement preceding the August 2007 document; he characterizes the August 2007 writing as a standardized form "receipt," and points out it did not state his salary, benefits or position. He argues: "Hence, despite the termination-at-will provision in the Receipt, other factors indicate that the Receipt was not intended to be the entire employment agreement between the parties. As such, the court's reliance on the Receipt to deny the existence of an implied contract as to the 'stock' was misplaced."

The question in connection with the court's grant of nonsuit on Migliore's wrongful constructive discharge claim is not whether there was an implied agreement as to issuance of stock, but whether the August 2007 writing was integrated as to that term of Migliore's employment so as to supersede any such agreement. Whether an agreement is an integration is a question of law. (*Haggard*, *supra*, 39 Cal.App.4th at p. 517.) As *Haggard* explains, an integration " 'may be partial, as well as complete; that is, the parties may intend that a writing finally and completely express certain terms of their agreement rather than the agreement in its entirety.' [Citations.] If only part of the agreement is integrated, the parol evidence rule applies to that part." (*Ibid*.)

We conclude, as a matter of law, that the August 2007 agreement is integrated as to the terms contained within that document, namely, the at-will nature of Migliore's

19

employment and grounds for his termination. By signing the document, Migliore agreed to both the at-will termination clause and the integration provision, and that document superceded all other agreements on the grounds for his termination. (Accord, *Haggard*, *supra*, 39 Cal.App.4th at pp. 518-519.) Based on the at-will nature of Migliore's employment, Migliore's claim that Nu Flow breached his contract of employment failed as a matter of law.

C. *Migliore's Evidence was Insufficient as a Matter of Law to Maintain a Constructive Discharge Cause of Action*

To support a cause of action for constructive discharge, "an employee must . . . prove . . . that the employer either intentionally created or knowingly permitted working conditions that were so intolerable or aggravated at the time of the employee's resignation that a reasonable employer would realize that a reasonable person in the employee's position would be compelled to resign." (*Turner*, *supra*, 7 Cal.4th at p. 1251.) "[T]he focus in a constructive discharge case is the employer's knowledge and conduct in forcing the employee to resign in light of the intolerable working conditions." (*Ibid.*) Migliore must present evidence that (1) the working conditions at the time of his resignation were so intolerable or aggravated that (2) a reasonable person in his position would have been compelled to resign, and (3) Nu Flow either intentionally created or knowingly permitted the intolerable working conditions. (See *Turner*, at pp. 1246-1250.)

Accepting Migliore's evidence and construing the remaining evidence in his favor, it shows that in the summer of 2007, Migliore noticed a "marked drop" in the level and frequency of communication between him, Manners and Howe regarding legal matters in

20

which he previously would have been involved. Migliore felt he was being eliminated from the company, even while he had a lot of work to do. Manners and Howe stopped coming to him for advice; the communication had stopped, and Migliore was not keeping them informed as to what was happening and why. For example, Nu Flow stopped having weekly legal meetings in about August 2007; Manners and Howe told Migliore they were too busy and the meetings were not needed. In another instance, Migliore was meeting with Manners regarding a settlement conference, and when Migliore tried to explain what to do, Manners cut him off, saying, "I know how to handle it" and walked out. During his last week of work at Nu Flow, Manners, Manners's wife, and Howe walked by his office without saying anything as if Migliore was not inside it. Migliore felt he was not given the opportunity to communicate with the principals and put in a position making it impossible to advise them. According to him, it would not have been fair to them or him to continue, as the principals did not know what they were doing legally even though they still considered themselves represented by general counsel, and he could not put himself ethically in the position of having a "fake attorney-client relationship."

We cannot say the above-summarized evidence is sufficient to support a claim for constructive discharge. In order to amount to a constructive discharge, working conditions or the employer's actions "must be *unusually* 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." (*Turner*, *supra*, 7 Cal.4th at p. 1247, italics added.) They must be "so unusually adverse that a reasonable employee in plaintiff's position ' " 'would have felt compelled to resign.' " ' " (*Ibid*.)

21

"[T]he employee's resignation must be *employer*-coerced, not caused by the voluntary action of the employee or by conditions or matters beyond the employer's reasonable control." (*Id*. at p. 1248.) Under this test, "the proper focus is on the working conditions themselves, not on the plaintiff's *subjective* reaction to those conditions." (*Gibson v. ARO Corp.* (1995) 32 Cal.App.4th 1628, 1636.) And, the employee's resignation must be more than "simply one rational option for the employee." (*Turner*, *supra*, 7 Cal.4th at p. 1246.) Because all jobs have frustrations, challenges and disappointments, " ' "[a]n employee may not be unreasonably sensitive to his [or her] working environment . . . ." ' " (*Id*. at p. 1247.)

Migliore's evidence is not that he was prevented entirely from e-mailing Manners and Howe or giving necessary legal advice to them, indeed, he testified he was capable of sending e-mails to them as late as October 28, 2007, days before he resigned. Evidence that Manners declined to listen to Migliore on one occasion, and that the communication among the principals was reduced in general, may have subjectively made *Migliore* feel unwanted or unable to do his job, but that is not the standard; such circumstances simply are not the sort of "*extraordinary and egregious*" (*Turner*, *supra*, 7 Cal.4th at p. 1246, italics added) working conditions that would overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job. (*Ibid*.) Quitting under these circumstances, in our view, was a rational option for Migliore, but it was not coerced or compelled by the acts or inactions of Manner and Howe.

Further, Migliore did not present any evidence that he complained to Manner or Howe that they would not listen to him, or that they were aware, before Migliore

22

resigned, that Migliore felt he could no longer properly communicate with or advise them. He first communicated the perceived fatal break down in their attorney-client relationship in his letter of resignation. As for the element of deliberately creating or knowingly permitting the intolerable working conditions, "the requisite knowledge or intent must exist on the part of either the employer or those persons who effectively represent the employer, i.e., its officers, directors, managing agents, or supervisory employees." (*Turner*, *supra*, 7 Cal.4th at p. 1251.) The employer "must be aware of the impact of the events on the employee, not merely of the fact that the event or conduct occurred." (*Gibson v. ARO Corp.*, *supra*, 32 Cal.App.4th at p. 1640.) This simply reflects the reasoning of *Turner*, in which the court explained, "By requiring employees to notify someone in a position of authority of their plight, we permit employers unaware of any wrongdoing to correct a potentially destructive situation." (*Turner*, at p. 1250.) The absence of such evidence rendered nonsuit proper on that ground alone.

### III. *Exclusion of Migliore's Testimony*

At trial, Nu Flow introduced evidence that at the time of his deposition, Migliore believed Manners and Howe acted in good faith in their employment negotiations; that they did not lie, trick or deceive him when they offered him 2.5 percent of the company. Migliore testified on cross-examination, however, that he had received new information that caused him to change his mind. During Migliore's redirect examination, Migliore testified he had had a recent conversation with Eric Palmer, Nu Flow's chief financial officer at the time of Migliore's resignation, which caused him to change the opinion he had given in his deposition. Without objection, Migliore explained that Palmer gave him

23

information that related back to when Palmer was Nu Flow's chief financial officer. Counsel tried to elicit what Palmer told Migliore, but the trial court sustained a hearsay objection to the evidence, ruling the statement was not coming in for Migliore's state of mind.

Migliore contends the trial court abused its discretion when it excluded his testimony about that conversation. Relying on Evidence Code section 1250[7] and *Holland v. Union Pacific Railroad Co.* (2007) 154 Cal.App.4th 940, he maintains the evidence did not go to the truth of the matter asserted, but was relevant to why Migliore had a different state of mind after talking to Palmer. Migliore argues exclusion of the evidence was an abuse of discretion and prejudiced him because he was not able to reconcile his trial testimony with his deposition answers. In response, Nu Flow argues Migliore's reaction to Palmer's statement was "utterly irrelevant" to the action, and thus the state of mind exception did not make Palmer's statements admissible.

It appears Migliore sought to admit the proffered evidence for nonhearsay use, that is, Migliore did not seek to introduce Palmer's statement for the truth of what Palmer

---

7      Migliore's reliance on Evidence Code section 1250 is unavailing. That section, which defines the present state of mind hearsay exception, reads in part: "(a) . . . [E]vidence of a statement of *the declarant's* then existing state of mind, emotion, or physical sensation . . . is not made inadmissible by the hearsay rule when: [¶] (1) The evidence is offered to prove *the declarant's* state of mind . . . at that time or at any other time when it is itself an issue in the action; or [¶] (2) The evidence is offered to prove or explain *acts or conduct of the declarant*." (Italics added.) An essential requirement of the statute is that the declarant's mental state or conduct be "itself an issue in the action." (See *People v. Riccardi* (2012) 54 Cal.4th 758, 814.) Of course, here, it was not the declarant's—Palmer's—state of mind at issue in the case; Migliore sought to introduce Palmer's out-of-court statement to show how it changed his *own* prior opinion about Manner's and Howe's good faith in negotiating with him.

said, but to prove the impact it had on the hearer, Migliore. (Accord, *Holland v. Union Pacific Railroad Co.*, *supra*, 154 Cal.App.4th at p. 947.) Nevertheless, we conclude Migliore's counsel did not make an offer of proof as to the substance of the evidence sufficient for this court to consider the claim of error.

Outside the jury's presence, counsel addressed the matter to the court as follows:

"[Migliore's counsel]: Well, there is the issue that Mr. Pfingst [Nu Flow's counsel] brought up when he asked what Mr. Migliore's belief was when he testified in his deposition that he didn't think that—at the time the representation of 2.5 percent was made, that he was being tricked or lied to. [¶] And then Mr. Pfingst says, 'You still believe that?' [¶] Mr. Migliore said, 'No.' [¶] And he said, 'Why not?' [¶] He said, 'I learned new information.' [¶] Now, Mr. Pfingst didn't ask what information it was. The information would be hearsay because it's a state-of-mind exception for—to explain why Mr. Migliore changed his mind. It doesn't go to the truth of the matter asserted. It just goes to an explanation of why Mr. Migliore has a different state of mind now after talking to Eric Palmer. [¶] So I think the door was opened up when Mr. Pfingst asked him, 'What changed your mind?' [¶] So if we're talking about his mind, we should continue that line of thought.

"Mr. Pfingst: I never asked, 'What changed your mind?' I just impeached him with his prior testimony.

"The Court: It's—and Mr. Palmer is coming in to testify?

"[Migliore's counsel]: I don't expect we're going to have time to call him. I don't know if the defense plans to call him.

25

"Mr. Pfingst: He lives in Canada.

"The Court: Well, then if he's not coming, it's hearsay, and it's not coming in for state of mind. [¶] Okay. What else?

"[Migliore's counsel]: Uh—

"The Court: Good.

"[Migliore's counsel]: Yeah. Nothing at this time, your honor."

A judgment shall not be reversed by reason of erroneous exclusion of evidence unless a miscarriage of justice is shown and it appears of record that "[t]he substance, purpose, and relevance of the excluded evidence was made known to the court by the questions asked, an offer of proof, or by any other means." (Evid. Code, § 354, subd. (a).) " 'The substance of evidence to be set forth in a valid offer of proof means the testimony of specific witnesses, writings, material objects, or other things presented to the senses, to be introduced to prove the existence or nonexistence of a fact in issue.' " (*In re Mark C.* (1992) 7 Cal.App.4th 433, 444.) "Failure to make an adequate offer of proof precludes consideration of the alleged error on appeal." (*Ibid.*)

At no point did Migliore's counsel identify or suggest what Palmer actually said to Migliore. "An offer of proof must consist of material that is admissible, it must be specific in indicating the purpose of the testimony, the name of the witness and the content of the answer to be elicited." (*In re Mark C.*, *supra*, 7 Cal.App.4th at p. 445; *Semsch v. Henry Mayo Newhall Memorial Hospital* (1985) 171 Cal.App.3d 162, 167, disagreed with on other grounds in *Atkins v. Strayhorn* (1990) 223 Cal.App.3d 1380, 1393, fn. 6.) The offer of proof " 'must set forth the *actual evidence to be produced* and

26

not merely the facts or issues to be addressed and argued.' " (*People v. Brady* (2005) 129 Cal.App.4th 1314, 1332, italics added; see also *Semsch*, at p. 168 [offer of proof of witness testimony must give "the precise testimony to be offered"]; *United Sav. & Loan Assn. v. Reeder Dev. Corp.* (1976) 57 Cal.App.3d 282, 294 ["An offer of proof that sets forth the substance of *facts* to be proved does not comply with Evidence Code section 354, subdivision (a), since *facts* do not constitute *evidence*."].)

While Migliore's counsel may have explained the purpose and relevance of the evidence to the court, he did not set out the *substance* of the information. (See *In re Mark C.*, *supra*, 7 Cal.App.4th at p. 445 ["The burden was on [the proponent] to make known to the court the substance, purpose, and relevance of the evidence."]; Evid. Code, §§ 354, subd. (a), 403, subd. (a), 801, subd. (b).) "Before an appellate court can knowledgeably rule upon an evidentiary issue presented, it must have an adequate record before it to determine if an error was made. For this purpose, we are limited to reviewing the matters appearing in the record." (*In re Mark C.*, at p. 445.) For the foregoing reasons, including the uncertainty in the record concerning the nature of the proffered evidence, we are unable to consider the argument and will not reverse the judgment on Migliore's stated ground.

### IV. *Special Verdict Form*

A. *Background*

Before the case went to the jury, the trial court expressed concern with the special verdict form as to Migliore's cause of action for breach of oral contract, observing that the second amended complaint referred to a promise to give stock, not stock options,

27

whereas Migliore's proposed verdict form read " 'stock or options.' "  It asked Migliore's counsel to amend the verdict form so that it referred only to stock.  Migliore's counsel objected, stating the evidence showed that stock, on the one hand, and stock options without any cost or "strike price," on the other, were essentially the same.  After the court issued its order, Migliore's counsel clarified:  "Just so that we're clear, that won't preclude us, either side, from arguing that stock is tantamount or equivalent to options without a strike price?"  The court responded:  "No, you can—you can argue whatever you want.  I just want the jury to be clear that—what we're talking about here."  With that understanding, Migliore's counsel agreed to correct the verdict form.  And, during closing arguments, he argued to the jury that "a stock option with no strike price is just like a stock.  No difference."

B.  *Contentions*

Migliore contends that, despite a "plethora of undisputed evidence that [he] was promised stock 'options,' " the trial court erred as a matter of law by refusing to permit the phrase "stock options" to be included on the special verdict form.  Migliore baldly asserts, "The trial court's ruling was prejudicial."  On this point, Migliore only raises the other asserted errors, arguing they were cumulatively prejudicial.  He states:  "It is not unreasonable to infer this case could have gone the other way, but for the court's errors.  Despite the multiple errors, one juror thought Nu Flow had entered into an oral agreement with Migliore for the promise of stock."  Migliore argues the jury verdict was "nullified" through the cumulatively prejudicial errors.

28

In response, Nu Flow points out the evidence was undisputed that Migliore was entitled to participate in its stock option plan before he resigned. It argues, however, that Migliore conceded at trial that he had no intention of exercising any stock options offered by Nu Flow because his claim then was that he was entitled to shares of stock outright, not options. Nu Flow states that the overwhelming evidence was that Nu Flow could not offer Migliore stock options without any requirement that he pay the appropriate strike price, and thus the court did not err by finding Migliore's proposed verdict form misleading and inaccurate.

C.  *Migliore Has Not Demonstrated Error or Prejudice*

Under Code of Civil Procedure section 624, a special verdict form presents to the jury each ultimate fact in the case, such that the trial court's role in implementing it is only to draw from the jury's conclusions any remaining required conclusions of law. (*Falls v. Superior Court* (1987) 194 Cal.App.3d 851, 854-855.) "The special verdict must present the conclusions of fact as established by the evidence, and not the evidence to prove them; and those conclusions of fact must be so presented as that nothing shall remain to the Court but to draw from them conclusions of law." (Code Civ. Proc., § 624.) An appellate court reviews de novo the issue of whether a special verdict form is a correct statement of the law which it is intended to apply. (See *Wilson v. Ritto* (2003) 105 Cal.App.4th 361, 366.)

We assess Migliore's challenge under settled review standards: As the appellant, Migliore bears the burden of showing not only error, but that prejudice was suffered due to the error. (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal,

§§ 416, 417, pp. 475-476; Code Civ. Proc., § 475 [disregard of nonprejudicial error-presumption against prejudice]; see *Bly-Magee v. Budget Rent-A-Car Corp.* (1994) 24 Cal.App.4th 318, 325-326 [no error or consequent prejudice where trial court refused to use defendant's proposed verdict form but used one in which nonparties subject to some percentage of fault were identified as "other persons" rather than three identified nonparty deputy sheriffs; verdict form was not confusing or ambiguous and could not have reasonably misled the jury].)

Migliore has not shown error. The question in the verdict form, consistent with Migliore's operative second amended complaint, called for the *ultimate fact* of whether there was an oral agreement for stock; it was not required to call out additional evidentiary facts as to whether the stock was promised by way of options. (See *Falls v. Superior Court*, *supra*, 194 Cal.App.3d at pp. 854-855; 7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 346, p. 404.)

Further, Migliore's cursory prejudice arguments do not provide sufficient ground to reverse the judgment, even assuming some error in the court's order to modify the verdict form. We cannot say that due to the form of the special verdict, the jury was confused, mislead, or unable to consider Migliore's theory. Counsel had every opportunity to, and in fact did, focus the jury's attention on the evidence that a stock option without a strike price and an outright grant of stock were one and the same thing. Nor has Migliore shown that had the verdict form contained the term "stock options," it is reasonably probable the jury would have reached a different result. The mere fact one juror believed Nu Flow had entered into an oral agreement for the promise of stock,

30

without more, does not establish a likelihood that the other jurors would have found such an agreement had been reached as to stock options at no cost to Migliore.

Having concluded Migliore's claims present either no error or no resulting prejudice, we reject his claim of cumulative error.

## DISPOSITION

The judgment is affirmed.


O'ROURKE, J.

WE CONCUR:

McCONNELL, P. J.

HUFFMAN, J.

31